## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff,*<br><br>v.<br><br>SIGNATURE FLIGHT SUPPORT<br>CORPORATION   *and*<br><br>HAWKER BEECHCRAFT SERVICES,<br>INC.,<br>*Defendants.* | Civil Action No.:<br><br>Filed:<br><br>Judge:<br><br>Date Stamped: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)–(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

### I.

### NATURE AND PURPOSE OF THE PROCEEDING

Defendant Signature Flight Support Corporation ("Signature") and Defendant Hawker

Beechcraft Services, Inc. ("Hawker Beechcraft") entered into an agreement, dated February 21,

2008, pursuant to which Signature would acquire the fixed base operations (FBO) of Hawker

Beechcraft. The United States filed a civil antitrust complaint on July ___, 2008, seeking to enjoin the proposed acquisition. The Complaint alleges that the effect of this acquisition would be to combine the only providers of FBO services at Indianapolis International Airport ("IND"), creating a monopoly and violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

At the same time the Complaint was filed, the United States also filed a Hold Separate and Preservation of Assets Stipulation and Order ("Stipulation and Order") and a proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, the defendants are required to sell either the Signature or Hawker Beechcraft FBO assets at IND to a purchaser who has the capability to compete effectively in the provision of FBO services to general aviation customers at that airport.

Until the divestiture of either the Signature or Hawker Beechcraft FBO assets at IND, the Stipulation and Order requires the defendants to take all steps necessary to preserve both companies' FBO assets at IND and ensure that Hawker Beechcraft's FBO business operates as an independent, ongoing, economically viable, competitive business at IND held entirely separate, distinct and apart from Signature's IND FBO business. Further, until the required divestiture is accomplished, the defendants must take all steps necessary to ensure that Hawker Beechcraft's FBO business at IND will be maintained and operated as an ongoing, economically viable and active line of business; that competition between Signature and Hawker Beechcraft in the provision of FBO services at IND is maintained during the pendency of the ordered divestiture; and that the defendants preserve and maintain their IND FBO assets. The Stipulation and Order thus ensures that competition is protected pending completion of the required divestitures and that

2

the assets are preserved so that relief will be effective.

The United States and the defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.

## DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.    *The Defendants and the Proposed Transaction*

Signature is a wholly-owned subsidiary of BBA Aviation PLC, a supplier of aviation machinery, support, and repair. Signature is a Delaware corporation with its principal place of business in Orlando, Florida. Signature is the world's largest FBO operator and operates more than forty-five FBO facilities in the United States. Signature's 2007 revenues from its United States FBO operations were approximately $600 million.

Hawker Beechcraft is a Kansas corporation with its principal place of business in Wichita, Kansas. Hawker Beechcraft is a manufacturer of business, special-mission, and trainer aircraft, and designs, markets and supports aviation products and services for businesses, governments, and individuals. The company also operates FBO facilities at seven airports in the United States, including IND. Hawker Beechcraft's 2007 revenues from its FBO operations were approximately $73 million.

By an agreement dated February 21, 2008, Signature proposes to acquire Hawker Beechcraft's FBO assets at seven airports in the United States for $128.5 million. IND is the only airport at which both companies compete in the provision of FBO services.

3

B.    *The Competitive Effects of the Transaction on the FBO Services Market*

1.    The Relevant Market

The Complaint alleges that the proposed transaction would eliminate competition in the provision of FBO services at IND in violation of Section 7 of the Clayton Act.  FBOs are facilities located at airports that provide fuel and related support services to general aviation customers.  General aviation customers include charter, private, and corporate aircraft operators, as distinguished from scheduled commercial airlines.

Fuel sales are the largest source of FBO revenues.  FBOs usually do not charge separately for services such as conference rooms, pilot lounges, flight planning, and transportation.  Instead, they recover the cost of these services in the price that they charge for fuel.  FBOs also derive income from hangar and office rentals, aircraft storage, tie-down and ground services, deicing, and catering services.

General aviation customers cannot obtain fuel, hangar, ramp, and related services at IND except through an FBO authorized to sell such services by the local airport authority, leaving general aviation customers departing from or landing at IND no alternatives to Signature and Hawker Beechcraft FBOs for these services.  Obtaining FBO services at other airports in the Indianapolis region would not provide an economically practical alternative for these general aviation customers.  Many general aviation customers select IND over other airports in the area for the available hangar space, as well as the necessary safety features of a control tower and longer runway length and the airport's proximity to downtown Indianapolis.  General aviation customers at IND would not switch to other airports in the Indianapolis region in sufficient numbers to prevent anticompetitive price increases for fuel and other FBO services at IND.

4

2.    The Proposed Merger Would Produce Anticompetitive Effects

Signature and Hawker Beechcraft are the only two competitors in the provision of FBO services at IND. Competition between them currently limits the ability of each to raise prices for FBO services. The proposed acquisition would eliminate the competitive constraint each imposes upon the other. This would lead to a monopoly at IND, resulting in higher prices for FBO services and lower quality of service in violation of Section 7 of the Clayton Act.

Successful entry would not be timely, likely, or sufficient to deter the anticompetitive effects resulting from this transaction. Timely entry sufficient to replace the market impact of Hawker Beechcraft would be difficult for several reasons. The entrant would need to get the approval of the airport authority, obtain permits, and construct facilities, all of which require extensive lead time to complete. Successful entry would be unlikely to occur in response to a small but significant and non-transitory post-merger price increase.

### III.

### EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The divestiture requirement of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the market for FBO services provided to general aviation customers at IND by establishing a new, independent, and economically viable competitor. The proposed Final Judgment requires the Defendants, to divest, as a viable ongoing business, either the Signature or the Hawker Beechcraft FBO assets at IND.

Hawker Beechcraft currently has a long-term lease with the IND airport authority under which it has rights to use several buildings and other assets, including fuel storage facilities, to provide both FBO and non-FBO maintenance for planes manufactured by the company. Signature

5

also operates its FBO business at IND under a long-term lease with the airport authority. Under the transaction agreement, Signature will obtain rights equivalent to Hawker Beechcraft's rights with respect to the FBO assets it uses to provide FBO services at IND. If Signature chooses to divest the Hawker Beechcraft FBO assets at IND, the acquiring company will acquire all interests and rights that Signature will acquire under its agreement with Hawker Beechcraft. This not only includes rights to use all buildings that Hawker Beechcraft currently uses to provide FBO services at IND, but also includes, when Hawker Beechcraft completes construction of a new facility at IND next year, the exclusive rights to use all the new buildings Hawker Beechcraft will build for the provision of FBO services at IND. Thus, a purchaser of either the Hawker Beechcraft Divestiture Assets or the Signature Divestiture Assets will have the same ability to compete in the IND FBO market as Hawker Beechcraft or Signature had prior to the acquisition.

In antitrust cases involving acquisitions in which the United States seeks a divestiture remedy, the United States seeks to require completion of the divestiture within the shortest period of time reasonable under the circumstances. A quick divestiture has the benefits of restoring competition lost in the acquisition and reducing the possibility that the value of the assets will be diminished. Section IV(A) of the proposed Final Judgment requires the defendants to complete the divestiture within ninety (90) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later.[1]

---

[1] The proposed Final Judgment also provides that this time period may be extended one or more times by the United States in its sole discretion for a period not to exceed sixty (60) calendar days, and that the Court will receive notice of any such extension. The proposed Final Judgment provides that if pending state or local regulatory approval is the only remaining matter precluding a divestiture after the 90-day period, the United States will not withhold its agreement

6

The assets must be divested so as to satisfy the United States, in its sole discretion, that the operations can compete effectively in the relevant market. Defendants must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with prospective purchasers.

In the event that the Defendants do not accomplish the divestiture within the period prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestiture of either the Signature or Hawker Beechcraft Divestiture Assets. If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six (6) months, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

The divestiture provisions of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the provision of FBO services at IND.

### IV.

### REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

---

to an extension of the period.

7

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

V.

**PROCEDURES AVAILABLE FOR MODIFICATION
OF THE PROPOSED FINAL JUDGMENT**

The United States and the defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the

Federal Register.

Written comments should be submitted to:

Donna N. Kooperstein, Chief
Transportation, Energy & Agriculture Section
Antitrust Division
450 5th Street, N.W.
Suite 4100
Washington D.C. 20530

## VI.

## ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial

on the merits against the defendants. The United States could have continued the litigation and

sought preliminary and permanent injunctions against Signature's acquisition of Hawker

Beechcraft's FBO assets. The United States is satisfied, however, that the divestiture of assets

described in the proposed Final Judgment will preserve competition for the provision of FBO

services at IND. Thus, the proposed Final Judgment would achieve all or substantially all of the

relief the United States could have obtained through litigation, but avoids the time, expense, and

uncertainty of a full trial on the merits of the Complaint.

## VII.

## STANDARD OF REVIEW UNDER THE APPA
## FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in

antitrust cases brought by the United States be subject to a sixty-day comment period, after which

the court shall determine whether entry of the proposed Final Judgment "is in the public interest."

15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as

9

amended in 2004, is required to consider:

>   (A)     the competitive impact of such judgment, including termination of
>   alleged violations, provisions for enforcement and modification, duration of
>   relief sought, anticipated effects of alternative remedies actually
>   considered, whether its terms are ambiguous, and any other competitive
>   considerations bearing upon the adequacy of such judgment that the court
>   deems necessary to a determination of whether the consent judgment is in
>   the public interest; and
>
>   (B)     the impact of entry of such judgment upon competition in the
>   relevant market or markets, upon the public generally and individuals
>   alleging specific injury from the violations set forth in the complaint
>   including consideration of the public benefit, if any, to be derived from a
>   determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d

1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[2]

    As the United States Court of Appeals for the District of Columbia Circuit has held, under

the APPA a court considers, among other things, the relationship between the remedy secured and

the specific allegations set forth in the government's complaint, whether the decree is sufficiently

clear, whether enforcement mechanisms are sufficient, and whether the decree may positively

harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief

secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would

_____

[2] The 2004 amendments substituted "shall" for "may" in directing relevant factors for
court to consider and amended the list of factors to focus on competitive considerations and to
address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15
U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the
2004 amendments "effected minimal changes" to Tunney Act review).

best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing

*United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at

1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001).   Courts have held

that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust
> consent decree must be left, in the first instance, to the discretion of the Attorney General.
> The court's role in protecting the public interest is one of insuring that the government has
> not breached its duty to the public in consenting to the decree.   The court is required to
> determine not whether a particular decree is the one that will best serve society, but
> whether the settlement is *"within the reaches of the public interest."*   More elaborate
> requirements might undermine the effectiveness of antitrust enforcement by consent
> decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]   In determining whether a

proposed settlement is in the public interest, a district court "must accord deference to the

government's predictions about the efficacy of its remedies, and may not require that the remedies

perfectly match the alleged violations."   *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also*

*Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland*

*Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the

United States' prediction as to the effect of proposed remedies, its perception of the market

structure, and its views of the nature of the case).

---

[3]   *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA]
is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F.
Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the
overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").
*See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the
decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the
public interest'").

11

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

12

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[4]

## VIII.

### DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that

---

[4] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and its responses to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

were considered by the United States in formulating the proposed Final Judgment.

Dated:  July 3, 2008

Respectfully submitted,

Angela L. Hughes (DC Bar #3034210)
Michelle Livingston (DC Bar #461268)
Trial Attorneys
U.S. Department of Justice
Antitrust Division
Transportation, Energy, and
Agriculture
450 5th Street, NW; Suite 4100
Washington, D.C. 20530

14

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2008, I caused a copy of the foregoing Complaint, proposed Final Judgment, Competitive Impact Statement, Hold Separate and Preservation of Assets Stipulation and Order, and Explanation of Consent Decree Procedures to be served on the defendants in this matter in the manner set forth below:

By electronic mail

For Defendant Signature Flight Support Corporation
Gordon L. Lang, Esq.
Nixon Peabody LLP
401 9th St. N.W., Suite 900
Washington, D.C. 20004
Telephone: 202/585-8319
Facsimile: 202/585-8080
Email: glang@nixonpeabody.com

For Defendant Hawker Beechcraft Services, Inc.
Richard Park, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202/639-7064
Facsimile: 202/639-7003
Email: richard.park@friedfrank.com

Peter Guryan, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004-1980
Telephone: 212/859-8477
Facsimile: 212/859-4000
Email: peter.guryan@friedfrank.com

Angela L. Hughes (DC Bar #303420)
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Telephone: (202) 307-6410
Facsimile: (202) 307-2784
Email: angela.hughes@usdoj.gov